## COUNTIES OF NEWPORT AND KENT, DURING THE SPRING CIRCUIT, 1863.

PRESENT:

Hon. SAMUEL AMES, Chief Justice.
Hon. GEORGE A. BRAYTON,
Hon. J. RUSSELL BULLOCK, } Justices.

---

## COUNTY OF NEWPORT, FEBRUARY TERM, 1863.

---

### State v. Joseph E. Macomber.

To warrant a conviction under Ch. 29, section 2, of the Revised Statutes, for voting at an election without being qualified to vote, the statute requires that the vote should be *fraudulently* cast; that is, with knowledge by the voter that he was not qualified to vote; and an honest mistake by a voter, as to his right, and an assertion of it by voting, will not render him liable under the statute, even though he is cognizant of the facts which constitute the defect in his right.

At the October term, 1862, of the Court of Common Pleas for the county of Newport, the prisoner was tried on an indict-

ment which charged, "that he, the said Joseph E. Macomber, at Portsmouth aforesaid, on the second day of April, A. D. 1862, at the annual election for State ·officers, to wit, for Governor, Lieutenant Governor, Senators, Representatives, Secretary of State, Attorney General and General Treasurer, held in the town of Portsmouth, and in all the other towns and cities of this State, on the first Wednesday of April, A. D., 1862, being said second day of April, A. D. 1862, did fraudulently vote, not being quali- fied to vote according to the constitution and laws of this State ; and then and there well knowing that he had no right to vote at said election, according to the constitution and laws of this State," &c.

At the trial before Mr. Justice Shearman, with a jury, it appeared, that the prisoner's name was upon the voting list pre- pared by the board of canvassers of the town of Portsmouth, for the election of State officers, held on the first Wednesday of April, 1862 ; that in the year 1861, no registry·tax was paid by or for him, but that a road tax of seventy cents was assessed against him for that year, which he worked out, and that on the assessor's book of the property tax of the town for that year, there was this entry : " Isaac Borden by J. E. Macomber, for real estate, $4000, $1000 for personal estate ;" the tax for the personal property amounting to eighty-two cents,—and that separately from this tax for personal propery, Isaac Borden was assessed for $40,000, personal property. It further appeared, that ·the pris- oner was the occupant of Isaac Borden's real estate, assessed against " Borden by Macomber," as above, in 1861, and that the tax collector of Portsmouth for that year having called upon Borden for his taxes, Borden paid him all the taxes assessed against him as above, except the above tax of eighty-two cents for $1000, personal property, which he said the prisoner must pay, and that he must see the prisoner about it ; that the collec- tor then called on the prisoner for that tax, and that he paid it in the year 1861. One of the assessors swore, as his explanation of the above assessment of the tax on real and personal estate against " Isaac Borden by J. E. Macomber," that it was the custom in Portsmouth, when a farm was let out, to tax it in that way, putting the name of the occupant after that of the owner,

but that there was no tax assessed against the prisoner for that year, to his knowledge. Three of the assessors for that year, including the town clerk, who was one of them, swore, that this was an assessment against the prisoner for $1000, personal property, for the year 1861,—the town clerk swearing that he had a distinct recollection, that the $1000 personal property tax against the name of "Isaac Borden by J. E. Macomber" was meant for the prisoner's tax; that he remembered this, because there was not another such case, to the best of his remembrance, on the book. It further appeared from the testimony of the three assessors last referred to, and 'as one of them swore from the former tax-books which he had examined, that, for the last few years, the prisoner had been taxed, by placing his name under Borden, among the "B's," for $1000, personal property; and by the testimony of the assessor, who had examined the former tax-books, (the town clerk,) that a few years earlier he found the prisoner taxed amongst the "M's," thus, "Joseph E. Macomber, $1000, personal property." All the witnesses agreed that the prisoner's general character for honesty was good, or that they never heard anything against it, or that it was as good as the "average." It further appeared, that before the meeting of the electors, in April, 1862, the prisoner was warned, on two several occasions, that he had no right to vote, on the ground that no tax was assessed against him, and that, as sworn by the witness who afterwards objected to his vote at the meeting, on the first occasion, the prisoner told him he "was trying to scare him;" and on the second occasion, that when told "there was no tax against him," the prisoner replied, "that it was done by neglect of canvassers, and that he should vote;" that the witness and another looked over the collector's book in the town-hall, in the prisoner's presence, and told him that they could not find his name in the book, and that the witness told him that he should complain against him if he voted; that "he had consulted legal advisers, and if he voted he would be liable to an action;" to which the prisoner replied, that "he knew all about it, and wanted none of my [his] advice." The prisoner also said, that he had paid a tax of eighty-two cents, but the witness did not remember that he said anything about the road-tax. On town-

meeting day, when the prisoner put in his ballot for Senator and Representatives to the General Assembly, the witness last referred to objected to the prisoner's vote; but the moderator replied, "that the name was upon the list, and that he must receive the vote." It further appeared, that the prisoner was returned by the town of Portsmouth as a juror, at the April term of the Court of Common Pleas, for the county of Newport, 1862.

Upon this evidence the jury found the prisoner guilty; whereupon he now moved this court for a new trial, upon the ground that the verdict was against the weight of the evidence, which was reported *in extenso* to the court.

The prisoner was indicted under Ch. 29, section 2, of the Revised Statutes, which was as follows:—

" SEC. 2. If any person in any election shall fraudulently vote, not being qualified, or having voted in one town, or ward, or district, or shall vote twice at the same election for the same candidate, or for different candidates for the same office, or twice in different places at the same election, he shall be fined one hundred dollars; and no person, after conviction of such offence, shall ever after be permitted to exercise the privilege of voting for any civil or military officer."

*Peckham, for the motion.*
*Burges, Attorney General, against it.*

AMES, C. J. The gist of the offence charged by this indictment against the prisoner is, not merely that he voted at the spring election in Portsmouth without being qualified to vote, but that he did so *fraudulently*, that is, with knowledge that he was unqualified. In this view of the offence, we are all of opinion that the evidence did not support the indictment. The prisoner's name was upon the voting list prepared by the canvassers for the moderator of the town meeting. Being a resident of Portsmouth, his right, under the constitution, to vote there in 1862, depended upon whether, being registered as a voter in that town on or before the last day of December, 1861, he had, for and within the year next preceding the time he offered to vote, paid a tax or taxes assessed against him to the amount of one dollar.

He had duly paid, in labor, a road tax to the amount of seventy cents, assessed against him for 1861, and had also paid, within the year, to the collector of taxes, upon his call, a personal property tax to the amount of eighty-two cents. The defect of qualification is supposed to exist in the fact that this last tax was, by the assessors' book, assessed against Isaac Borden, and not against him. It was, in fact, with a tax on real estate, assessed against "Isaac Borden by J. E. Macomber," whatever that assessment means. However ambiguous and irregular such an assessment may be, three out of four of the assessors swore, that what they intended by it was, to assess the prisoner eighty-two cents for $1000, personal property, and Borden, whose tenant the prisoner was, for the tax on $4,000 of real estate. The other evidence supports the view that such was their intent. Some years before, the prisoner had been assessed by his own name, standing in its proper alphabetical place on the assessment book, for $1000, personal property; but for the last few years, as we should judge from the testimony, since he had become the tenant of Borden, for the same sum,—his name being coupled with Borden's,—against whom the assessment was designed to charge the tax of the real estate, whilst Borden was separately assessed for $40,000, personal estate. Now, the question was not, as urged by the Attorney General, merely, or principally, whether this was a rigidly correct assessment of a personal property tax for $1000 against the prisoner, but whether, under such circumstances, he might not fairly deem himself assessed for the tax, especially when the collector had called upon him for it, and he had paid it within the year before he voted as he had done in years before, and the canvassers had put his name upon the voting list.

It is insisted, that as the facts were called to the attention of the prisoner before he voted, by a person who challenged his vote and threatened to prosecute him if he voted, that the prisoner voted at his peril. It is evident that the prisoner regarded, as he treated, this, as an attempt to scare him from the exercise of his right; and we are yet to learn that a mistake about one's rights, with full knowledge of all the facts relating to them, and an honest assertion of them, is equivalent to fraud, under such a

statute as this.   The statute, 9 Anne, c. 10, § 40, visited a penalty upon a postmaster, who *wittingly*, *willingly* and *knowingly* detained letters, and caused them to be detained and opened; but in *Meirelles* v. *Banning*, 2 Barn. & Adolph. 909, the King's Bench held that a postmaster who delivered a bankrupt's letters to his assignee, believing that the assignee was entitled to them for the purposes of the commission, and such having been the practice of the office for more than thirty years, was not liable to the penalty.   It is not the mere act or neglect, but the offence, consisting of the bad intent coupled with it, which the law, in such cases, designs to punish.   The distinction between acts done honestly, under a mistaken sense of right, and acts done fraudulently, with a consciousness of wrong, is familiar to every one who has had occasion to trace the boundary line between trespass and larceny.

All the evidence in this case, as reported to us, tends to show that the prisoner, reputed to be an honest man, voted under the belief that he had a right to do so; and without canvassing whether the property tax that he paid to the collector was regularly and properly assessed against him, we see no reason to doubt that he thought that it was; and accordingly, on that ground, order the verdict against him to be set aside, and a new trial to be granted to him, in the Court of Common Pleas for the county of Newport.